In re Mark Technologies Corp. Melissa D. Miller, Council for Appalachia. Noah Brian Frazier, Chapter 7 Trustee. Patrick M. Arnett, Council for Appalachia. Bert Constructions, M2. Reg J. Norman, Council for Appalachia. David Papadies, Thomas R. Finney, Council for Appalachia. Jody Malta, Council for Appalachia. David Barrick, Council for Appalachia. E.B.H. The Germans Energy Team, and if Mr. Lorenzo is present, he is not assigned then, and if he could state his name, so we can find no Appalachia. We agree in your honor. Thank you. Mr. Finney, you're participating by phone? We're checking in with you. Are you there? Yes. Good morning, your honor. I'm here. And can you hear us? Yes, I can hear you very well. Thank you. Thank you very much. We'll call on you. A couple things I want to say about this case. One is the council got together and sort of allocated their time among themselves. I reallocated, but I followed their program, and I appreciate your consultation on this matter. Secondly, this is a fairly long factual record. I want you to know that we've marched through it. I think we have some handle on what's occurred in this case, so let's get to the heart of it. The trustee has five minutes. Please introduce yourself. Thank you, your honor. I'm Elisa Miller, attorney for Chapter 7 trustee. Your honor, as you noted, this is a long and tortured case, and it's a case that evolved over time as many bankruptcy cases do. It's a case that was filed as a seven. It was converted within months to an 11. I'm sorry, it started as 11, converted to a seven, in large part because of noncompliance and in large part because the court found some issues with the way the debtor was operating. The debtor in this case is just one of the parties to this appeal. It's the party to the abandonment appeals, the 2016 appeals. The other two appellants in these appeals are Tenderland Renewables and Altamesa Finance, both entities. And all three entities, the debtor, Altamesa, and Tenderland, are all controlled by Mr. Jones, so we'll refer to them as the Mark Jones entities kind of together because they are one of the- Counsel, may I interrupt you? This is what they say. They say, well, this property is worth $3 million maybe under your regime. The liens against it are in excess of $20 million, so there's nothing for unsecured creditors here. And if you would allow the properties to be abandoned back to us, we'll pursue the appeals. If we pursue the appeals, there might be a bigger payday for people, but at least the people with a financial interest in the outcome will be running the show. Why should the trustee be permitted just to sell this off to benefit secured creditors and possibly the administration of the estate? Take it on. Yes, Your Honor, and that actually was going to come down towards the bottom, and that really is the overarching theme. That's the KVN argument. And the problem with that argument is that the debtor, first of all, only asks that the real property be abandoned. And the reason they only ask for the real property to be abandoned is because at the time they were seeking abandonment, number one, they knew about the sale and the settlement. Number two, they were contending that Alta Mesa, pursuant to this assignment by Mr. Jones to Mr. Jones through different entities, owned the personal property, the wind farm operations that were on the real property. We proved over time that that was just a false, perjurious argument, that it was not true. It was contrary to, and as set forth in the declaration of Mr. Barman, contrary to what the findings in the state court were and evidence in the state court. The other problem was that the EDF litigation or the appeal allowed us to settle. And when you look at this case, it's a big picture. It's the settlement motion provided for the division of funds in the trust account, 20% to the trustee, 80% to EDF. The debtor took a far lesser piece of the trust fund, but more money out of the estate. But the entire package to the estate was $1.1 million. It wasn't just this $560,000, 360 of which is allocated for taxes, but hopefully we'll never have to pay those taxes, and that's what we continued to say. So it's not just the property. The other problem is that these creditors didn't trust Mr. Jones. They had all been litigating with him for years. And so the trustee negotiated. We made a deal to get $1.1 million into the estate to stop the bleed, to stop the expenditure of funds, which the only way that funds would have come in would have been if we had prevailed after probably years and years and years on the EDF appeal and then after it got sent back. The debtor never specifically said what it was that the problem was. The debtor would put in their motions for new trial in the state court and said this is why we're going to win on appeal. But they never put in the other side of the story. But the trustee looked at both sides of the story and said, we have a tough road to hoe in any circumstances, and in this trial particularly and especially as the facts progressed and the court found that Mr. Jones continued to commit perjury throughout the case. But before we even get to the merits of either of the appeals, these appeals should be dismissed for- Well, you say Mr. Jones committed perjury. Maybe that's true or not. That's never been litigated, has it? The court made specific findings in its ruling. The court said that it was concerned about that. But, I mean, did he take the stand? Did he testify? Testified through declarations, Your Honor. Okay. Thank you, counsel. We're going to go to the next segment, okay? Pardon? We're going to go to the next segment. Your five-minute throw. Oh, thank you, Your Honor. Thank you. It just flies by. It's kind of drive-by. We'll hear from the attorney from the buyer, please. Good morning, Your Honor. Thank you. Tom Finney, appearing for the Appalachian Altamesa 640 LLC, which is the buyer of the wind farm project in this case. The BAP earlier deferred ruling on the mootness of this appeal, and I wanted to make the request that since we're addressing the merits and mootness together in one appeal, that the BAP really address both and dismiss the appeal on mootness, but also deny it on the merits as an alternative grounds. In the order deferring ruling on mootness, the BAP cited the two cases, which I wanted to touch on because I think it really emphasizes what's right about the sale process in this case. In Thomas v. Namba, the 2002 BAP case, in that case the trustee didn't request a good faith finding, and there was no finding in the sale order, and on appeal the trustee sought to dismiss it, but the BAP remanded it saying you can't just imply good faith. There was no record at all. In Fitzgerald 2010 BAP case, the trustee again did not seek a good faith finding. There was no evidence of good faith, but the trustee snuck, so to speak, a good faith finding in the sale order, and the BAP said you can't do that. There was no record to support the finding, and no request had been made for the finding. In this case, I think the trustee and the bankruptcy court thoroughly learned the lessons of those cases, and if you look at the sale motion at Excerpts of Record 8, there's a very robust request for good faith finding. There is the declaration of the trustee. There's a declaration of the buyer that details the extensive marketing and the competitive bidding for this project. The buyer submitted a declaration of good faith, and there's really no question that the buyer has no connection with any party in this matter, and it really is what I consider to be a poster child for what a good faith purchaser is supposed to look like when you get in this situation and a sale is being contested. Secondly, I wanted to touch on the issue of whether the court even made a finding, because although in a lot of the papers and the way the appellant stated the issue about mootness, as they stated, did the bankruptcy court err in finding good faith, there's an argument, particularly in the reply, that the language of the sale orders at paragraph 8 is buyer is deemed to be a good faith purchaser, entitled to the protections of 11 U.S.C. section 363M, and the argument is that the deemed is less than a finding, that there are uses of the word deemed to mean something different than a finding. Counsel, can I interrupt you for a second? This is Judge Kurtz. I think it's fairly clear from this record that not much was raised pre-sale about lack of good faith on the part of the buyer, and so there's nothing really there on appeal. The only issue, it seems to me, is this question of something happening after the closing that would raise an issue of good faith, that there was some kind of misconduct after the order was signed associated with the delay in closing the transaction. Yes, Your Honor, that's exactly right. There was no raising of this good faith issue until the trustee made her motion to dismiss the appeal as moot, and there's never been any evidence presented by the appellants about this good faith issue. There's been evidence to refute what was presented by the appellants, but I think the really important part of that is that the argument, there's an argument raised that there's bad faith post-sale, but it really makes no sense, and even if it was true, I don't think it's relevant to any of the good faith issues. The argument is that the buyer is, they speculate that the buyer somehow delayed the close of escrow, which makes no sense because the buyer was incurring losses, waiting and diligently trying to close the sale, and there is plenty of evidence before the court that that's what happened. It was the appellant that was wanting to delay the escrow, not the buyer or the trustee. It's quite the opposite, and the other issue, the other argument raised is that there was this other property, not part of the sale, that was on the neighbor's property, and the neighbor insisted on moving it off of his property. Jones was trying to sell it, and the evidence is that the buyer ended up buying that forklift at Mr. Jones' request, but the allegation is that the buyer somehow moved the forklift, and it's just irrelevant to any issue. Counsel, I'm going to interrupt you there. I think I understand what you're saying. You're saying that at this point, these are only unsubstantiated allegations. There's no meat on these bones, so we'll look at that. I'd like to hear now from the attorney for five minutes from EDF. Thank you. Good morning. Counsel, it's been alleged that the unsecured creditors and other creditors of the estate would be better off if they pursued that appeal against your client on that judgment as opposed to the sale, and that the sale is just a way for you to get out from an undeserved victory in state court. Can you address that? Yes, Your Honor. The appeal was from a judgment rendered after a significant trial that went through two phases in the Riverside Superior Court. It's a significant judgment, $22 million in favor of my client. If the Jones-related parties had really had the best interests of creditors at heart, they would have filed this bankruptcy case within the 90-day preference window after my client recorded its judgment lien, and they could have easily avoided the lien and realized value for creditors. Judge Johnson commented on that more than once, right? Absolutely. And if that's what Mr. Jones and his entities wanted to accomplish, they could have done that quite easily. We would have then had a large unsecured claim, and the dynamics in this case would have been significantly different. We were very confident in our ability to succeed on appeal. We believe that the state court got the case right. The jury made the correct analysis, and the trial court made the correct findings of fact. That confidence led to us being willing to settle with the trustee in the way that we did. And I want to point out that even if we had somehow lost on appeal, in all likelihood that would have resulted in a remand to the Riverside County Superior Court,  and we would have then been dealing with trying that case either there or in the bankruptcy court, all in an estate that didn't have any real resources to litigate that dispute. And most importantly, by the time I think we would have gotten there, the key testimony in that case supporting the debtor's position was Mr. Jones' testimony. And by the time we made it through the bankruptcy case, Mr. Jones had perjured himself on numerous occasions, something that I'm sure that my state court litigation counterparts would have used to great success in front of the Riverside. Well, certainly taken inconsistent positions. Inconsistent positions is the most charitable way of describing it, Your Honor. And so I think that his credibility at that point was shot. He was the key witness for the debtor in that case. He managed that litigation once already and lost to the tune of $22 million. It's a very large number. And so I think we would have prevailed. Was that all actuals, by the way? I believe it was, Your Honor, with some prejudgment interest. I want to say about $16 million in actual damages, and then the rest was interest and things of that nature. And what's the status of the trust fund litigation or the dispute over that? Your Honor, that litigation is set for a pretrial conference in March. Mr. Jones no longer and his entities, Tenderland Renewables, and I believe Alta Mesa Finance is part of that litigation as well. No, actually, I take that back. It's just Tenderland Renewables, no longer have counsel. And so my client and the trustee are bringing a motion in that case to strike Mr. Jones and the Tenderland entities answer and ask the court to enter default. That motion has not yet been filed, but it will be. And then if the bankruptcy court doesn't grant that motion, we will probably be bringing a motion for summary judgment. And that has some impact on the settlement with the estate. Significant impact, Your Honor, because 20 percent of those proceeds, assuming that my client and the estate prevail, 20 percent of those proceeds will end up flowing to the bankruptcy estate. I do want to point out that my client has essentially taken on, and this is another reason I think the sale and the settlement make so much sense for the bankruptcy estate. My client has taken on most of the risk related to this continued litigation with Tenderland Renewables and the Jones entities. We had this $22 million lien against a piece of real estate, and we ended up recovering after all of the deductions from the waterfall about 3 percent of our total claim from the sale of the real estate. So the bulk of our recovery is going to come if we prevail in this litigation regarding the trust fund, because my client will get 80 percent of that money if we prevail. Very briefly, Your Honor, I want to address the regen point in Ray Trism that the appellants have made, that the bankruptcy judge improperly bound the parties to terms of the settlement that they didn't agree to. Even if regen was controlling authority in this circuit or if there was authority in the Ninth Circuit on this point, the bankruptcy judge didn't require my client or anyone else to agree to terms or impose terms upon us. He gave us the opportunity and guidance and suggested certain things that he had problems with as far as the settlement goes, and then the parties had an opportunity to analyze those new terms and then agree to them on the record. So this is a completely different case, and what Judge Johnson did is not at all unusual in the context of settlements that often change at the hearing to either address concerns that the bankruptcy judge had or that the other parties had. Thank you. Thank you. Thanks very much. The trustee gets three more minutes. I feel like I'm being short with all of you, but, you know, it's kind of a one-sided fight right now. It is, Your Honors, and thank you very much again for hearing this appeal. All of the appeals that are before the court today, and there's four of them, all have the same standard of review, and they're all abuse of discretion. And it's our position that Judge Johnson did not abuse his discretion in any way. With regard to the settlement motion, the trustee presented pages and pages and pages of evidence as to why each of the factors under the A&C properties test were met, why the settlement was in the best interest of the creditors, why the settlement was better and more cost-effective than going forward with the litigation, and why the settlement should be approved. And the settlement paved the way for the sale. So assuming, and we believe, we have confidence, we're not over, you know, we're not so cocky as to believe that we absolutely will win, but we believe we have very good facts in the Tenderland matter and that all that Tenderland has, if at all is a claim in the estate for funds due, because Tenderland continued to shift their position as to why they purportedly owned the Tenderland funds. Turning back, but that being said, that's why we believe this is a good settlement, because at the end of the day, $1.1 million, approximately, you know, plus or minus a few hundred, is coming into the estate from the settlement and from the sale. And after fees are deducted, after costs of administration, there will be monies floating down. And all of the cases cited say you look to see where they're going to float down. And at the end of the day, unfortunately, and this happens... Is there something a little bit unseemly? I mean, at one point in time, it was like $15,000 coming into the estate, and it's sort of grown largely under the direction of the judge saying, I'm not going to approve this, but when you come back to me with something more like that, I will approve it. Now, that's a little bit unusual. With all due respect, Your Honor, it's not exactly like that. There's always been the same amount of money coming into the estate. $560,000 on the sale, the balance, about $570,000 out of the trust fund. The judge, just looking at the sale, said, well, if you're going to pay taxes, and we've always said it's a reserve, we're not saying we have to. The worst possible scenario, if all that has to be paid, then there's only a limited amount left. And so I want to make sure that some of it's going to drop down below admins. That's why the Jones-related parties keep saying it's only this much money, it's not $560,000, it's only $15,000. But it's not $15,000, it's $560,000 out of the sale. And what KVN says in particular, and KVN was a one-asset, tiny little case, is that the court needs to look and see if, in the trustee's best business judgment, the carve-out is sufficient for a distribution. But KVN didn't say in that case that that tiny little bit was not sufficient. In fact, the KVN court, as Your Honor may recall, said, we're sending it back. So, again, we believe these cases are moot. The bill has been run, the sale closed, deeds were recorded, funds distributed. The settlement was confirmed. Satisfactions of judgments were recorded. Litigation was dismissed. And that litigation and those deeds cannot be revived. And looking back at the appellant's oppositions to the motion to dismiss, they say that everything can be unwrung. But there's no law to dispute what we showed as the law, that especially with regard to the settlement account. Your Honors, I see my time is up. Thank you very much. This matter is being submitted. We have kind of made you rush through this a little bit. I want you to appreciate we've spent a good deal of time on this case, and I think we have a handle on what's going on here. Thank you very much. Thank you. Thank you, Your Honor. Please call the next case.
judges: Kurtz, Faris and Lafferty